Mr. Justice James
delivered the opinion of the Court:
This is an action for injuries to the plaintiff’s real estate in Washington City, by unlawful occupation and use of the *415 •adjoining and neighboring streets. The declaration states that plaintiff was owner of certain lots and buildings used for purposes of business and as dwelling houses, from which he derived a profit; that defendant unlawfully, &c., laid along First street its Metropolitan Branch Railroad, connecting the same with its Baltimore and Washington Branch Railroad by a “ Y ” switch or turnout, and has maintained and used said tracks within 40 feet of plaintiff’s premises on First street and 110 feet of plaintiff’s premises on Iv street, to the injury of the same by leaving and allowing to stand in front of and near to the same for a long space of time, and by unlawfully moving and shifting to and fro along said streets its engines and cars, so as to blockade and obstruct the same and prevent plaintiff from approaching his premises, and so damaging his trade and business; and by causing smoke, cinders, &c., from defendant’s engines to enter plaintiff’s premises; and by causing, by means of its engines and cars great jarrings, which caused the ceilings of plaintiff’s houses to crack; and by unlawfully, &c., using and occupying said First street, and more particularly between I and K streets, “ for the general purposes of a freight yard and depot, and also for parking cars and trains;” and by passing and repassing plaintiff'’s dwelling house on First street, with its trains and ■engines, at an unauthorized and unnecessary rate of speed, by all of which grievances the plaintiff has been prevented from having so useful, beneficial, &c., use and occupation of his said dwelling houses and premises as he might, and •otherwise would, have had; and whereby his said premises have been depreciated in value, &c.
The second count alleges that defendant’s railroad track on First street and along I street, commonly known as the Y switch or turnout, was placed and built there by defendant “ unlawfully and without any right or authority whatsoever;” that its use and maintenance in front of plaintiff’s premises, for the purpose of running and storing loaded and empty *416 cars thereon, in front of plaintiff’s premises, was unlawful, and that such construction and use have injured the enjoyment and value of plaintiff’s premises.
The cause proceeded to trial and verdict was for defendant. Motion for a new trial was overruled, and the cause is now here on a case stated and on bills of exception. At the argument, however, the plaintiff relied upon the alleged errors of law in refusing certain of his prayers, and in granting certain prayers of the defendant, and in certain parts of the charge; referring to the case only as showing the-bearing of'these ruling's.
The testimony on the part of the plaintiff tended to show his ownership of the property in question, and that, so far .as his property on First street was concerned, he had suffered the grievances complained of. We find no testimony tending to show that his property on K street was injured by the alleged causes. The plaintiff further produced in evidence the following acts of Congress relating to the Washington Branch and the Metropolitan Branch of the Baltimore and Ohio Railroad, and the"following ordinance of the late corporation of Washington:
The Act of March 2, 1831, Ch. 85, 4 Stat. at Large, 476 ; the Act of February 26, 1834, Ch. 13, 4 Stat. at Large, 672 ; the Act of March 3, 1835, Ch. 28, 4 Stat. at Large, 757; the Act of July 25, 1866, Ch. 251, 14 Stat. at Large, 250, and the Ordinance of Council, passed January 17, 1867, 64, Ch. 148, 74.
The Act of March 2, 1831, authorized the extension of the Baltimore and Ohio road into Washington City, and provided as follows, as to its route and terminus: “The said company, in passing into the District aforesaid,, and constructing the said road within the same, shall enter the city of Washington at such place, and shall pass along such public street or alley to such point or terminus within said city as the said company shall find best calculated to promote the objects of said road,” &c.
*417 This act related to what is now distinctively called the Washington Branch of the Baltimore and Ohio Railroad.
The Act of February 26, 1834, merely extended the time allowed by the Act of 1831 for commencement of the road and completion of one track.
The Act of 1831 had forbidden the com panj^ to enter upon any lot or square belonging to the United States. The Act of March 3, 1835, authorized it to locate and construct its road through certain designated squares, and then provided as follows:
“Sec. 2. The main stem of the said railroad,.after passing through the squares or lots above named, or any of them, shall not be constructed west or south of a point at the intersection of H street north with Delaware avenue, until the route from that point to the final termination of the main stem of said road shall be surveyed and approved by the mayor, board of aldermen, and board of common council of the city of Washington; and when the said route shall be so surveyed and approved, the said company shall be, and they are hereby, authorized to construct the said railroad on the said route, under such restrictions and conditions as may be agreed upon by the said railroad company and the mayor, board of aldermen, and.board of common council of the said city of Washington.”
By the original Act of 1831, the company was authorized generally to “ pass along such public street or alley to such point or terminus * * * as such company shall find best calculated to promote the objects of said road.” By the section just quoted, this capacity was limited. The route of the road “ south of a point at the intersection of IT street and Delaware avenue ” must first be surveyed and approved by the mayor, board of aldermen, and board of common council of the city of Washington; and when such route should be so selected, the company was authorized by the legislature to construct its road thereon. Clearly this *418 provision did not, in any way, affect the powers of the company north of that point. It could still select the streets which it would occupy north of H street. The only question is, whether the sectiou just quoted took aw'ay its capacity to use streets at all south of that intersection.
Of course the Acts of 1831 and 1835 are to be construed together, as intended to carry out one common object; especially as the latter is expressly described by its title as supplementary to the other. Now, the original act is to be understood as intending to give the company first the capacity to use streets, and next to select them. North of the intersection of H street north and Delaware avenue it still retained that power of selection, notwithstanding the supplementary act; and we see nothing in a provision that, south,of that point, the route should be selected by the corporation of Washington, which affects the charter power of the railroad company to use streets, except as to the matter of selection. The two acts are consistent when so construed. The original act gave to the companj'' the selection of streets to be occupied. The supplementary acts, without mentioning streets, or expressly taking away from the company the power to use them, gave the selection of a route to the corporation of Washington. We think that, when construed together, both intended that the use of streets should be lawful as before, provided the selection should be no longer vested in the company, but in the municipality. What the municipal authorities might lawfully select is not defined by the statute. It is neither stated that they may, or that they may not, select a route along the streets, but inasmuch as the use of streets by the company had been declared to be lawful and to be one of its* corporate capacities it would certainly be consistent with that general capacity of the company that the city authorities should select streets to which the company should apply such capacity. On the other hand, it was undoubtedly competent for the city authorities to select a route which *419 ■did not lie upon any street. The only question, however, is whether the company’s original capacity to use a street was still left in existence, with the single modification that it should be such street as should be selected for it by the corporation of Washington. The company’s power to select the street which it should use was the only matter affected by the supplementary act.
If there could be any doubt that the Act of 1835 recognized the use of a street as still lawful, if such street were selected by the authorities of Washington, it would be removed by the provisions of Section 5. It was there said: It shall be lawful for the said company * * * to obtain, by gift or purchase, any lot or lots adjacent to any street or avenue along which the said company shall construct their said road or branches, and to hold and improve the same in such manner as may be necessary, &c., * * * and the said company shall be authorized to extend and construct tracks of railway into any lot or lots so held by them, in connection with the tracks on any adjacent street or avenue : Provided, that the free use of any street or avenue shall not be impaired thereby.”
And here, in answer to the objection that a municipality cannot grant the use of its streets for railroad purposes without express legislative authority to do so, it should be ■observed that the grant in this case was directly from the legislature and not from the municipality. It merely depended for its application upon an appointment to be made by the city authorities. An appointer does not grant, and does not need the power to grant. The Secretary of the Interior, or the mayor, or this court might have been designated to make the appointment.
The capacities thus given to the Washington branch ■come in question only as capacities claimed by the Metropolitan branch. Whether they have enured to the latter depends upon the Act of July 25, 1866, 14 Stat., 250. That act refers in terms to the Maryland act, which authorized the Baltimore and Ohio Company to build a road from *420 a point on its line between Knoxville and Monacacy Junction, through Frederick and Montgomery counties, to the boundary of the District of Columbia, &c. It provides as follows:
“That the Baltimore and Ohio Railroad Company shall be, and they are hereby, authorized to extend into and within the District of Columbia the road aforesaid, to such point or points, terminus or terminii, as may be agreed upon between the said company and the ■corporation of Washington, in respect of a road within the limits of Washington, and between the said company and the corporation of Georgetown, as respects a road within the limits of Georgetown. An[d] the said Baltimore and Ohio Railroad Company are hereby authorized to - have and exercise the same powers, rights and privileges, and'shall be. subject to the same restrictions, in the extension and construction of the said road, into and within the said District, as they have, may exercise or possess, or are subject to within the State of Maryland, under and by virtue of their charter or act of incorporation from the State of Maryland, and shall be entitled to the same franchises, rights, compensation, benefits and immunities in the use of the said road as are provided in the said charter.”
Sec. 2. “ That all the provisions of the several acts of Congress relating to the lateral road authorized to be built into and within the District of Columbia by an act passed March second, eighteen hundred and thirty-one, and entitled ‘An act to authorize the extension, construction and use of a lateral branch of the Baltimore and Ohio Road into and within the District of Columbia,’ and the supplements thereto, be, and they are hereby, declared to apply to the Baltimore and Ohio Railroad Company so far as they are severally applicable to the location, construction and use by the said company of the road now authorized to be constructed into and within the said District.”
This last section applies to the Metropolitan branch the *421 provisions relating to the Washington branch “ so far as they are severally applicable to the location, construction and use of the latter.” The effect of this is to make the location of the Metropolitan branch upon a street lawful if placed there by agreement between the company and the corporation of Washington. On January 17, 1867, the board of aldermen and board of common council passed an ordinance which provided that the Baltimore and Ohio Company should be authorized to extend its Metropolitan branch “into and within the City of Washington, entering-said city at the intersection of its northern boundary and New York avenue, crossing said avenue, and passing-through the northwest corner of square No. 710 to First street east; thence along the center of that street to the present track of the Washington branch of said Baltimore and Ohio Railroad and along the route of that track, east of New Jersey avenue, to the present station in square No. 632, with the privilege of constructing and maintaining two tracks within the city along the above-described line and of using steam engines thereon.”
Section 5 of the same ordinance provided “that whenever the Baltimore and Ohio Railroad Company should assent to this ordinance, or use the privileges granted, such acceptance and the ordinance should constitute a contract.” It was duly accepted and the right to use First street became perfect.
As the company derived its authority to use streets under the Act of 1835 by direct grant from Congress, and not from the municipality, so, under the Act of 1866, it derived that power from Congress, to take effect on such streets as should be appointed by agreement between the same authorities and the company.
So far, then, as the main stem on First street is concerned, the plaintiff cannot maintain his contention that the mere presence of the Metropolitan branch on that street is a nuisance, because of being an unauthorized structure.
*422 But it is contended tliat this statute does not authorize the location thereof two tracks. We think that' it does. It is true it does not mention the subject of two tracks, but it authorizes the extension into the city and all the way to the company’s station of its road; and it refers us to, and in effect embodies, the Maryland Act. We have a right, therefore, to look into the provisions of the latter, and we learn from them that the road to be thus extended was a double track road. If it was lawful to locate this road on First street at all it was lawful to locate there the two tracks which it was authorized to have.
We have next to consider the lawfulness of the struéture commonly known as the “ Y.”
The eleventh section of the Act of 1835 provided as to-the Washington branch, “That the'said company are further authorized to construct branches of their road from the-main stem thereof within the -said city to such place or places and in such number of tracks, as the corporate authorities of Washington shall assent to or permit: Provided, That such branches shall not pass through any of the reservations.” The fifth section shows that the “ branches,” which the Washington branch was authorized to construct, might be located on streets as. lawfully as the main stem might be. We have already quoted the latter? but for the sake of clearness will repeat here the passage referred to. It provided that: “It shall be lawful for said company, and they are hereby empowered to obtain by gift or purchase, any lot or lots adjacent to any street or avenue along which the said company shall construct their said road or branches and to hold and improve the saíne,” &c. Whatever, then, the fourth section may have meant by “ branches,” it is clear that they, as well as the main stem of the Washington branch, might lawfully be located on and along a street. According to the construction which we have already adopted, this, provision enured to the Metropolitan branch. . -
*423 But it was insisted at the argument that the structure called the “Y” was not a “branch,” within the meaning of Section 4 of the Act of 1835; and secondly, that the pretended assent to the construction of this so-called branch was not given by any persons who were authorized to exercise the power of assent vested originally in “ the authorities of the City of Washington.”
The first question is, what may be held to be included in the term “ branches? ” The plaintiff’s contention is that the statute meant a road which should diverge from the main stem at a point within the city, and should run to a “place;” for example, some town outside thereof. What places were intended is to be determined only by construction. The language of the provision is, that branches may be made “ to such place or places * * * as the corporate authority of the city of Washington shall assent to or permit.” The intention is, that where this assent is given, the railroad company has at once the right to traverse the space intervening between the main stem and the “place” assented to. Clearty it is not to be supposed that the municipal authority was, by its assent or permission, to determine what should happen to territory outside of its jurisdiction. It follows, therefore, that the “places” intended by the Legislature were places within the city; and as the statute says nothing about the kind of place within the city to which a branch might be constructed with the assent of the municipal authorities, it must be held to apply to any point in the city. As a matter of fact,-the structure in question, called the “ Y," may be said to be either a branch road diverging from the Washington branch of the Baltimore and Ohio Railroad, and running to a “place” on the Metropolitan branch, or to be a branch diverging from the Metropolitan branch of that company, and running to a “place” on the Washington branch. Under either description it is a-branch within the meaning of the fourth section of the Act of 1835, and is a lawful structure, provided it was constructed with the assent or permission of *424 persons authorized to exorcise the power of assent vested originally in “ the corporate authority of the city of Washington.” Whether it was done with such assent 'is the next question.
By section 41 of the organic Act of February 21, 1871, (Sec. 96, Rev. Stat.) the District of Columbia was made “ the successor of the corporations of Washington and Georgetown.” The power in question, then, vested by transfer in the District of Columbia, and the questiou is, in what manner was it to be exercised by the District? In Barnes’ Case, 91 U. S., 540, it was held that the several boards established by the same act were merely instruments of that corporation, and that, notwithstanding their respective powers were vested in them directly by the Legislature, and notwithstanding'those boards were not subject to control by any superior authority of the corporation, in respect of the matters thus committed to them, yet their acts in respect to those matters were the acts of the District. Now, the power of assent, which was vested in the corporate authority of the city of Washington, had reference, of course, to the use of streets; and when that power was transferred by the Act of 1871 to the District, it was necessarily to be exercised by the District through -the instrumentality of the board which had control of the streets. If that board assented to the use of the streets in the location of the Y branch, that assent was the act of the District, as successor of the corporation of Washington.
The defendant produced as evidence of the necessary action of the board, a létter of A. R. Shepherd, vice-president of the board, to Win. Keyser, second vice-president of the railroad company, stating that “ this board will permit the connection and the proposed use of the streets.” It was objected at the argument that this letter was not sufficient evidence of any action on the subject by the board. It was admitted, however, without objection or exception, and no instruction relating to such assent was asked. We need not *425 consider therefore, whether it was the best evidence of the fact, and must treat it as tending to prove an assent. It may be remarked further, that the long acquiescence in tliis use of the streets is evidence that the board had acted and given its assent.
We are of opinion, then, that the plaintiff’s first prayer, to the effect that the use and occupation of First street by the defendant were without legal right, and his third prayer to the effect that two tracks on First street were not authorized ; and his second prayer, to the effect that the use and occupation of I street, between Delaware avenue and First street by the defendant, with its Y track, were without legal right, were properly refused by the court. For the same reason we hold that the defendant’s third prayer, to the effect that its track “ lcuown as the ‘ Y,’ connecting its main stem with its Metropolitan branch, is a legal structure, and if the use of the said track by the defendant was a reasonable one, no recovery can be had by reason of the inconvenience caused by such use,” was properly granted.
But notwithstanding these tracks were authorized and lawful the plaintiff would be entitled to recover for any grievances suffered by him by reason of an unauthorized use of such lawful structures. It has already been stated that he introduced evidence tending to show grievances of that kind.
Upon that evidence he offered the following prayer:
4. “ If the jury believe from the evidence that the plaintiff was the owner or occupant of the premises described in the declaration and that the defendant, during the period of time from April, 1883, to April, 1884, or any part of it, used First street northeast, in this city, between I and K streets N. E., and in front of and near to the said premises, the said dwelling-house and store of the plaintff, for the purpose of their unloading and delivering freight, and for parking cars, and for moving and shifting its cars, so loaded and unloaded, back and forth, in front of the said premises of *426 the plaintiff, by locomotive engines propelled by steam, and said moving and shifting of cars, if any, were attended with loud and disagreeable noises, which could be distinctly heard in the plaintiff’s said dwelling by day and at night, and preventing sleep at night time, and permitted and allowed its locomotive engines to stand in front of and near to the plaintiff’s said premises while so engaged in moving and shifting said cars, if any, and while waiting for trains to arrive; and that soot, smoke, and cinders were thrown from said engines while so engaged into and upon the said dwelling-house of the plaintiff, and that said soot, smoke, and cinders were so thrown into and upon said dwelling-house and premises in such quantities and so frequently as to be an annoyance and inconvenience to the plaintiff, and to injure and to soil the walls and furniture in said dwelling-house; and if they further find that said First street in front of and near to the plaintiff’s said premises was so blockaded by the parking and moving and shifting of cars and engine, if any, as to prevent plaintiff from having a reasonable ingress and egress to and from his said premises, and that said noises and said soot, smoke, and cinders and said parking of cars, and said shifting and moving back and forth, if any, interfered with the enjoyment by the plaintiff of his said dwelling-house, then the plaintiff is entitled to recover in this action.”
But the court refused to grant said prayer and allow the same to be read to the jury as presented, and modified and explained the same as follows :
“Gentlemen of the jury, remembering that the defendant has the right to be on First street and on I street with its tracks and cars, if you believe from the evidence that the acts complained of and as sot forth in this prayer were done by the defendant, but only to a reasonable extent, then you must find for the defendant. This modification is not intended to apply to the loading or unloading of cars in the street. The defendant had no right to convert this street into a freight depot and to load or unload its cars therein.”
*427 The effect of this modification of the above instruction is,, to declare that the defendant had a right to use First street and the “Y” on I street, near the plaintiff’s property, for thé purposes of parking and of shifting its cars, to a reasonable extent; for these are the grievances set forth in the declaration and in the prayer which was thus modified. As-to the parking of cars, this instruction was cured by the charges.
The cause was then argued to the jury by counsel for the respective parties; whereupon the court, after explaining the nature of the case and the theory of the respective parties,, instructed the jury, in substance [“that the tracks and side track of the defendant, which were involved in this controversy, were legal structures,] [and that the defendant had the right to use and maintain them, so long as they were occupied and used reasonably and properly;] [that the defendant had a right to transport its cars along and over the tracks, to move and shift them, and in so moving, shifting and transporting, to employ reasonable and usual means therefor,] [and that if the odors and smoke and cinders and annoyances,complained of by the plaintiff were things which were incident to the proper and reasonable use by the defendant of such tracks and side track in moving, shifting and transporting its cars over and along their line, then the plaintiff was not entitled to recover;] [but if, on the other hand, such tracks were used improperly or unreasonably, or if for any reason the smoke or cinders and annoyances which the plaintiff complained of were unreasonable in amount or extent, and beyond what was reasonable and proper, then for. the annoyance and inconvenience occasioned by such excess,, the plaintiff would be entitled to recover;] that the defendant had no right to employ the street or tracks in the street, for the purpose of a freight yard or freight depot, and had no right to load or unload its cars thereon or therein or to store or park them there; that the proper employment of the tracks and side track w-as unobjectionable, [and that the *428 •defendant hacl the right to use the track as side tracks are ordinarily used in the coupling and. shifting of cars, and things incident thereto, and that if in such employment it became necessary for their cars to occupy or stand upon such side track for a reasonable length of time, that would furnish no cause for complaint.”]
The plaintiff excepted-to so much of this charge as is indicated by brackets.
■ The jury were, in. effect, instructed that the defendant had a right to use the side tracks on the streets near the plaintiff’s place of business, as side tracks are ordinarily used in the coupling and shifting of cars. The ordinary use of side tracks for these purposes, without reference to their situation, was thus made the standard of the legitimate use of side tracks placed on the streets of a city under a special grant of the use of the streets. We have repeatedly held that the concession of a privilege to use the streets of a city was necessarily limited to such use as should not destroy the enjoyment of them as streets, and that what might be an authorized use of side tracks and land acquired by purchase or by condemnation, was an unauthorized abuse of streets. The question is not how a side track may be used, but how a street may be used by a party to whom a special use has •been conceded.
In Neitzey vs. The Baltimore and Potomac Railroad, 5 Mackey, 34, this court, speaking by Mr. Justice Cox, said: “In the first place, the jury ought to be educated to discriminate clearly between a rightful and wrong use of the streets.” Then, after speaking of the company’s right to have numerous tracks in the immediate vicinity of its depot or station, the court said : “ These were privileges which are conferred by competent authority, and any inconvenience which may result to private individuals from their careful these acts, to convert the public highways, the streets and *429 avenues of the city, into freight yards. The proper place for cars, when not in use, is the depot, station, or yard of the company, and the proper place to load and unload freight is a freight station. It has' no right, therefore, to incumber the street with cars, and to leave them there when not in use. That is an unauthorized, occupation of the public highway.
It will be observed that the principle here applied is, that certain uses of the company’s tracks are unauthorized, because they constitute unauthorized uses of the highway.
In Hopkins vs. Baltimore and Potomac Railroad, 6 Mackey, 311 (314), this court, speaking by Mr. Justice Hagner, said : “ The fourth exception’had a more especial reference to the use of Maryland avenue by the company for shifting and making up its freight trains, in addition to its alleged loading and unloading of freight, and the alleged leaving the cars standing in the avenue for an unreasonable time.
“We hold the only use that can lawfully be made of Maryland avenue by the company in shifting and making up its trains must be confined to such use as may be reasonably necessary for' the purpose of carefully taking its cars into or of carefully taking its cars out of the station to place them in freight trains on the track. To authorize the occupation of the avenue as a general shifting ground would be to subject it to a use that could not have been contemplated by the legislature when it authorized the company ‘to extend its lateral branch * * * by way of Maryland avenue to the Long Bridge.’ Such an occupation would constitute a nuisance more grievous and far more dangerous than the other complained of; and would almost amount to-a practical condemnation of this part of the avenue as the private property of the company. * * * A railroad company may and should possess itself of proper accommodations on its own property, where this dangerous process of shifting and making up trains may be conducted in *430 safety, without continual risk and inconvenience to the public. Citizens have the right at all times to cross and travel the streets and send their children and servants along them on lawful errands without peril or delays and to enjoy some intervals of quiet from the noises of movements .that should be conducted in proper enclosures of this company in more secluded portions of the city, where ampler accommodation could be found than is now afforded within the freight station on Ninth street, which is admitted to be insufficient for that purpose.”
These observations point out in the clearest manner the limitations which distinguish the extent of the right acquired by a grant of the use of streets for railroad purposes and the extent of its right to use side tracks as such and in ■a different place. The question is simply what is authorized in the particular situation, and the right of use within a •city is determined by the fact that it is withiii a city.
On the ground that there was error in the instruction on this point, the judgment is reversed and a new trial is granted.